USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8-12-14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **GREGORY MARTIN,** | : | |
| Plaintiff, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
| - against - | : | |
| | : | **13-CV-2827 (VSB) (RLE)** |
| **CAROLYN COLVIN,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| Defendant. | : | |

**TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:**

## I.   INTRODUCTION

Plaintiff Gregory Martin commenced this action under the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security

(the "Commissioner") denying his claim for disability benefits.  Martin argues that the decision

of Administrative Law Judge Katherine Edgell (the "ALJ" or "Edgell") was erroneous, not

supported by substantial evidence, and contrary to the law.  On January 6, 2014, Martin moved

for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,

asking the Court to reverse the decision of the Commissioner and remand the case for a

calculation and award of benefits.  (Mem. Law Supp. Pl.'s Mot. for J. on Pleadings ("Pl. Mem.")

23.)  Alternatively, Martin asks that the Commissioner's decision be reversed and the case

remanded for a new hearing and decision.  (Pl. Mem. 23.)  On March 14, 2014, the

Commissioner cross-moved for a judgment on the pleadings, asking the Court to affirm the

Commissioner's decision and dismiss the Complaint.  (Mem. Law Supp. Def.'s Mot. for J. on

Pleadings ("Def. Mem.") 1, 24.)  For the reasons that follow, I recommend Martin's motion be

**GRANTED** in part, the Commissioner's motion be **DENIED**, and the case be **REMANDED** for

a new hearing and decision.

## II.    BACKGROUND

### A.    Procedural History

Martin applied for Social Security Disability Insurance Benefits ("SSDIB") on January 31, 2011. (Tr. of Admin. Proceedings ("Tr.") 152-54.)  In his application, Martin stated that his disability began on May 31, 2001, and resulted from his diabetes, back pain, neuropathy, left knee pain, gout, Meniere's disease,[1] and lumbar spine impairment.  (Tr. 167.)  The application was denied on April 21, 2011 (*id.* at 104-06), and shortly thereafter Martin requested a hearing before an ALJ.  (*Id.* at 110.)  Martin appeared before ALJ Katherine Edgell on February 10, 2012, by videoconference.  (*Id.* at 34, 36.)  The ALJ issued a decision on March 3, 2012, finding that Martin was not disabled within the meaning of the Act and was not entitled to SSDIB.  (*Id.* at 12-22.)  Martin requested review by the Appeals Council on April 16, 2012.  (*Id.* at 8.)  On March 18, 2013, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Martin's request for review.  (Tr. 1-6.)  Martin filed this action on April 29, 2013.

### B.    The ALJ Hearing

#### 1.    Martin's Testimony

Martin was born on February 2, 1952.  (*Id.* at 38.)  He attended some college, but did not graduate.  (*Id.*)  Martin enrolled in the Police Academy in 1973, and received training on fingerprint analysis, crime scene photography, and computer-based research.  (*Id.* at 39-40.)  He was promoted to detective in 1986, and continued in this position until his retirement on May 31, 2001.  (*Id.* at 41.)  Martin has not worked since his May 2001 retirement and his pension is his sole source of income.  (*Id.* at 39, 41.)

---

[1] Meniere's disease is a condition that causes hearing loss and vertigo.  *Dorland's Illustrated Medical Dictionary*, 486 (28th ed. 1994).

2

Martin testified that he was in a car accident in the early 1980's and that he has experienced back pain for the past thirty years as a result. (Tr. 43.) He stated that the pain progressively worsened over the years and contributed to his retirement from the police force because he "physically couldn't do the job." (*Id.* at 44.) He was unable to take a disability retirement because of the length of time between his injury and his retirement. (*Id.*) Martin stated that he has received medication, physical therapy, and pain management treatment for his back pain since 2001. (*Id.* at 45-46.)

Martin further testified that he has diabetes-related neuropathy[2] of the hands and feet, a condition that causes him "swelling, burning" pain when walking and at other times. (*Id.* at 47-48.) This pain caused him to spend most days since 2001 in bed, and made him unable to walk around his house for longer than thirty minutes prior to December 31, 2006.[3] (*Id.* at 57.) Martin stated that the neuropathy is treated with medication, which has been "extremely" helpful, and that he sees an endocrinologist to manage his diabetes and his diet. (Tr. 48-49.)

Martin stated that his diabetes causes him vision problems that prevent him from driving at night. (*Id.* at 51.) Fluctuations in his blood sugar caused a vein to pop in his eye, a condition for which Martin had eye surgery in 2005. (*Id.*) Martin stated that he continues to see an eye doctor to treat his ongoing vision problems. (*Id.*)

Martin also testified that problems with his balance have caused him to fall numerous times, but that his doctors have been unable to determine the cause. (*Id.*) Similarly, Martin

---

[2] Neuropathy refers to a functional disturbance or pathological change in the peripheral nervous system. *Dorland's Illustrated Medical Dictionary*, 1132 (28th ed. 1994).

[3] To receive Disability Insurance Benefits ("DIB"), a person must be both disabled and insured for DIB. Social Security Act, § 223(c). A person's insurance coverage will continue when he has "at least 20 quarters of coverage in the 40-quarter period ending with that quarter." 20 C.F.R. § 404.130(b)(2). Martin had adequate quarters of coverage to stay insured through December 31, 2006. (Tr. 157.) As such, he must show that he was disabled prior to December 31, 2006, to eligible for DIB.

stated that he is unable to bend over fully without fainting. (*Id.*) The ALJ stated these symptoms could be considered "positional vertigo" and Martin concurred. (Tr. 50.)

Martin stated that, since his retirement in May 2001, he has lived a sedentary life and has been mostly confined to his home. (*Id.* at 52-56.) He wakes up every morning around ten o'clock and stays at home for the duration of the day. (*Id.* at 52.) Prior to December 31, 2006, Martin sometimes watered the garden, but he was unable to go for walks or to dress himself on a daily basis. (*Id.* at 52-54.) From May 2001 through December 2006, Martin did not leave the house to go on vacation, to visit a house of worship, or to socialize with friends. (*Id.* at 53-54.) He did, however, have friends visit him at his home for holidays and on some weekends. (*Id.* at 54-55.) Martin stated that he used to drink alcoholic beverages nightly despite his physicians' protestations, and that he currently drinks alcoholic beverages on the weekends. (Tr. 55.) Since his retirement, Martin's wife maintains the home, pays all the bills, and does all the cooking. (*Id.* at 52-53, 56.)

###    2.    Medical Evidence[4]

####       a.    Medical Evidence Prior to January 1, 2007

#####          (1)    Dr. Scott Bernstein, Treating Physician (2000-2006)

Dr. Scott Bernstein first treated Martin in August 2000, and Martin saw him for eighteen additional visits through September 2003. (*Id.* at 456-75, 480.) In a medical report dated September 19, 2001, Dr. Bernstein noted that Martin had uncontrolled type-two diabetes and uncontrolled hypertension. (*Id.* at 475.) On April 20, 2003, Martin complained of pain in his toes and a scaly rash on his feet, and Dr. Bernstein diagnosed diabetic neuropathy. (*Id.* at 462.)

---

[4] Because there is an abundance of medical evidence about Martin's conditions, only the most salient medical evidence is discussed.

On September 2, 2003, Dr. Bernstein noted that Martin's diabetes and hypertension were controlled and that his neuropathy was much improved. (*Id.* at 456.) He also noted that Martin was still experiencing pain in his right big toe and referred him to a podiatrist. (Tr. 456.) At this point, Martin was taking several prescription medications to address and control his hypertension, neuropathy, diabetes, and cholesterol. (*Id.*)

From September 2003 to September 2004, Martin complained to Dr. Bernstein of problems with his balance, back pain, and continued neuropathic pain. (*Id.* at 442-55.) On September 18, 2003, Martin reported that he veered to the right while trying to walk straight. (*Id.* at 455.) On October 22, 2003, Dr. Bernstein wrote that Martin has suffered from "bulging discs since 1990" and increased Martin's pain medication. (*Id.* at 453.) On November 10, 2003, an MRI of Martin's spine revealed a herniated nucleus pulposus[5] in his lower back with an obstruction of the opening on the right side of the spine and pus formation, as well as disc bulging at the L5-S1[6] level of his spine. (*Id.* at 451.) At his February 18, 2004 visit, Martin reported that the neuropathy in his feet improved fifty percent and that the pain in his arms ceased after he stopped taking his cholesterol medication. (Tr. 447.) Martin also stated he no longer felt "burning." (*Id.* at 445.) By the summer of 2004, however, Dr. Bernstein diagnosed Martin with heel spurs and loss of muscle control of the arms. (*Id.* at 444.) On June 15, 2004, Martin reported that the shooting pain in his left heel returned when his pain medication wore off. (*Id.* at 443.) Dr. Bernstein attributed the pain to continued neuropathy. (*Id.*)

In May 2005, Dr. Bernstein noted that Martin was experiencing acute gout[7] and

---

[5] Nucleus pulposus is the semi-fluid substance inside the vertebral discs, which can escape through abnormal openings in the spine. *Id.* at 756, 1159.

[6] L5-S1 is the joint where the lumbar segment of the spine meets the sacrum segment. *Id.* at 1819.

[7] Gout is a form of arthritis that occurs when uric acid crystalizes in the extremities. *Dorland's Illustrated Medical Dictionary*, 713.

prescribed a plant-based medication to treat the pain. (*Id.* at 434.) In July 2005, Martin experienced a gout flare-up when he stopped taking his medication. (Tr. 432.) Dr. Bernstein told Martin to avoid alcohol and increased the dosage of his medicine. (*Id.*)

In August 2006, Martin's visited Dr. Bernstein twice. (*Id.* at 427, 430.) On August 27, 2006, Dr. Bernstein noted that Martin was experiencing "chronic" back pain, dizziness when bending over, headaches, and hypotension. (*Id.* at 427.) Dr. Bernstein also circled "sensory intact" on a medical checklist. (*Id.*) On August 30, 2006, Martin visited Dr. Bernstein after he fainted in his home. (*Id.* at 430.) Dr. Bernstein noted that Martin experienced neck pain and decreased strength in his left arm and that Martin continued to have four vodka drinks a night, which might have contributed to the fainting. (Tr. 430.)

**(2) Dr. Steven Yablon, Treating Nephrologist (2003-2006)**

Dr. Steven Yablon first treated Martin on August 11, 2003, for excess protein in the urine and hypertension from diabetes. (*Id.* at 757.) Martin's exam was "mostly unremarkable," although his glucose levels were high and he was experiencing neuropathic pain in his hands and feet. (*Id.*) Dr. Yablon prescribed medication to control Martin's blood pressure and pain. (*Id.*) At a subsequent visit the following month, Martin's neuropathy and blood sugar had significantly improved. (*Id.*)

In January 2004, Dr. Yablon noted that Martin had no new complaints but that his foot pain continued. (*Id.* at 866.) In November 2004, October 2005, and June 2006, Dr. Yablon wrote that Martin had no new complaints or was "feeling well." (Tr. 867, 871, 872.) On September 14, 2006, Martin complained of back pain and bilateral heel spurs, but otherwise said he felt fine.[8] (*Id.* at 873.)

[8] Martin continued to see Dr. Yablon through September 2006, but the doctor's handwritten notes are mostly illegible. (Tr. 865-73.)

### (3)    Dr. Earl Zeitlin, Treating Neurologist (2003-2006)

Dr. Earl Zeitlin of Rockland Neurological Associates saw Martin from November 2003 through October 2010.  (*Id.* at 712.)  Martin first visited Dr. Zeitlin on November 5, 2003, to address his balance problems.  (*Id.* at 739-40.)  Dr. Zeitlin noted that Martin's imbalance was likely caused by the sensory system, and that Martin had chronic low back pain and diabetic neuropathy.  (*Id.* at 739.)  A sensory examination revealed that Martin had decreased sensation in his feet, irritated nerves in the right wrist, and absent reflexes in the lower extremities.  (*Id.*)  Dr. Zeitlin ordered MRI scans of Martin's head and lumbar, and increased his analgesic medication dosage.  (Tr. 740.)  The MRI revealed that there was no evidence of peripheral neuropathy,[9] and that Martin's prolonged reflexes and abnormal left leg sensation were indicative of early mild neuropathy.  (*Id.* at 703.)

On March 29, 2005, and on May 11, 2006, Martin visited Dr. Zeitlin and complained of painful neuropathy, but the doctor's notes from both visits are illegible.  (*Id.* at 357, 360.)  In a letter to the ALJ, Dr. Zeitlin stated that Martin's neuropathy and back pain would have left him "disabled from work" starting in 2003 "on a permanent basis."  (*Id.* at 712.)

### (4)    Good Samaritan Hospital (2004)

On December 10, 2004, Martin checked into Good Samaritan Hospital after experiencing slurred speech and severe imbalance.  (*Id.* at 750.)  The emergency room physician noted that Martin had "diminished vibratory sensation" in both toes, difficulty with tandem walking, and mild tremors.  (*Id.* at 751.)  The physician determined that Martin had a TIA.[10]  (Tr. 752.)

---

[9] Peripheral Neuropathy refers to neuropathy that involves more than one set of nerves. *Dorland's Illustrated Medical Dictionary*, 1132, 1330 (28th ed. 1994).

[10] A transient ischemic attack, more commonly referred to as "mini-stroke," occurs when a constricted blood vessel caused a deficiency of blood to the brain. *Id.* at 861, 1591.

Martin was prescribed an aspirin-based medication, and a brain MRI at a follow-up appointment.[11]  (*Id.*)  In a letter dated December 29, 2004, the radiologist administering the MRI stated that the results were "normal."  (*Id.* at 749.)

### (5)     Dr. Deborah Raice, Treating Endocrinologist (2006)

Martin first visited Dr. Deborah Raice on March 8, 2006. (*Id.* at 562.)  He complained of a lack of appetite, pain in his feet, and chest pain.  (*Id.*)  Dr. Raice noted that Martin had diabetes, kidney insufficiency syndrome, and absent ankle reflexes.  (*Id.*)  She ordered blood sugar level testing, urinalysis, and lipid panel labs.  (Tr. 562.)  Martin saw her several times throughout 2006, after this initial visit.  (*Id.*)

### b.     Medical Evidence After January 1, 2007

### (1)     Dr. Scott Bernstein, Treating Physician (2007-2011)

Throughout 2007, Martin visited Dr. Bernstein to complain of right ankle swelling, which was sometimes accompanied by knee pain.  (*Id.* at 403-08.)  On January 17, 2007, Martin reported that he was feeling well.  (*Id.* at 403.)  Dr. Bernstein noted that Martin's hypertension had increased and that he had swelling of his right ankle.  (*Id.*)  On October 10, 2007, Dr. Bernstein noted that Martin exhibited limited extension of his right knee, and referred him for an orthopedic evaluation.  (*Id.* at 408.)

On May 1, 2009, Martin complained that the pain in his back and weakness in his legs was worsening.  (Tr. 416.)  Dr. Bernstein prescribed anti-inflammatory medication.  (*Id.*)  On August 24, Dr. Bernstein noted that physical therapy was "not helping" Martin's back pain, and that he was experiencing muscle stiffness and spasms.  (*Id.* at 418.)  An MRI of Martin's spine in September revealed that Martin had degenerative disc disease, a left-sided disc herniation at L5-

---

[11] Additionally, Dr. Zeitlin performed an angiogram, which yielded "normal" results.  (Tr. at 711.)

S1, and a small right-sided disc herniation at L4-5. (*Id.* at 476.) By August 10, 2010, Dr. Bernstein noted that Martin had begun using a walker for his unsteady gait and back pain. (*Id.* at 423.) Martin's diabetes, hypertension, and lipids were "stable." (*Id.*)

On February 2, 2011, Dr. Bernstein completed a Multiple Impairment Questionnaire, in which he wrote that Martin suffered from diabetes with neuropathy, chronic back pain from lumbar disease with neuropathy, renal insufficiency, and hypertension. (Tr. 395.) These diagnoses were supported by symptoms of unsteady gait, decreased sensation in the lower extremities, and a lack of reflexes in both feet. (*Id.*) Dr. Bernstein noted that Martin could sit for one hour and stand for one hour during the course of an eight-hour workday. (*Id.* at 397.) He stated that these symptoms started in 2001. (*Id.* at 401-02.)

On March 14, 2011, Dr. Bernstein submitted a Narrative Report, in which he wrote that Martin was "disabled" and unable to work because of chronic pain starting in 2001. (*Id.* at 480.) He stated that Martin's conditions were "chronic and irreversible," and that he would be unable to work in any capacity. (*Id.*)

### (2) Dr. Steven Yablon, Treating Nephrologist (2007)

In January 2007, Dr. Yablon ordered at CT scan of Martin's abdomen and pelvis. (Tr. 252.) The scan revealed diffuse fatty infiltration of the liver. (*Id.*) Martin continued to see Dr. Yablon throughout 2007, but the doctor's notes are illegible. (*Id.* at 225-26.)

### (3) Rockland Neurological Associates (2007-2010)

On October 3, 2008, a doctor at Rockland Neurological Associates administered an inner ear test to check Martin's balance. (*Id.* at 755.) All of the tests came back within the "normal limits." (*Id.*)

### (4)    Dr. Joseph Paskowski, Eye Doctor (2007)

On December 20, 2007, Martin visited Dr. Joseph Paskowski for problems with driving at night.  (*Id.* at 385.)  An exam revealed that Martin had 20/40 vision in his right eye and 20/20 vision in his left eye.  (Tr. 385.)  The remaining handwritten notes were illegible.  (*Id.*)

### (5)    Dr. Deborah Raice, Treating Endocrinologist (2007-2010)

Martin visited Dr. Deborah Raice three times in 2007, complaining of pain and burning in his feet and arthritis in his knees.  (*Id.* at 569-72.)  On March 14, 2008, Dr. Raice noted that Martin had laser surgery to correct worsening retinopathy.[12]  (*Id.* at 575.)  She wrote that Martin "did not understand about diet and how his glucoses might be better," and noted that Martin continued to drink three to four vodka drinks per night.  (*Id.*)  Dr. Raice advised Martin to continue his current medication to manage his diabetes.  (*Id.*)

### (6)    Dr. Barry Schoenberg, Treating Podiatrist (2007-2010)

Martin first visited Dr. Barry Schoenberg on July 5, 2007, for treatment of his dry, scaly feet and pain in his right heel.  (Tr. 376.)  Dr. Schoenberg found that Martin's symptoms were consistent with diabetic neuropathy, and that Martin had fungal nail infections in both feet, severe xerosis[13], and plantar fasciitis[14] in his right foot.  (*Id.*)  Martin's treatment consisted of an anesthetic injection in his right heel and removal of his nails and xerotic skin.  (*Id.*)

Martin continued to visit Dr. Schoenberg through 2010 for the pain in his feet.  (*Id.* at 361-77.)  On August 16, 2010, Dr. Schoenberg found a new soft tissue mass on Martin's left foot that exhibited plantar warts and continued neuropathic disease.  (*Id.* at 377.)  Martin's treatment

---

[12] Retinopathy refers to persistent or acute retina damage, which can be caused by diabetes.  *Dorland's Illustrated Medical Dictionary*, 1455 (28th ed. 1994).

[13] Xerosis refers to abnormally dry skin and mucus membranes.  *Id.* at 1850.

[14] Plantar fasciitis occurs when the tissue on the sole of the foot becomes inflamed.  *Id.* at 612, 1301.

consisted of removing warts, lubricating the feet, and chemically removing a lesion.  (*Id.*)

### (7)  Dr. Mark Medici, Treating Orthopedist (2007-2012)

Dr. Mark Medici began treating Martin on October 17, 2007, for arthritis of the right

knee. (Tr. 701.)  In a letter to the ALJ dated January 5, 2012, Dr. Medici stated that Martin's

arthritis would have been present prior to December 2006.  (*Id.*)

### (8)  Good Samaritan Hospital (2009)

On July 22, 2009, Martin checked into Good Samaritan Hospital for neck pain and arm

weakness resulting from a fall down the stairs four days prior.  (*Id.* at 347.)  An examination by

the emergency room physician revealed that Martin had musculoskeletal pain in his neck, but

that his other systems did not present any issues.  (*Id.* at 348.)  Martin was prescribed a muscle

relaxant and anti-inflammatory medication, and was given a warm neck compress.  (*Id.* at 349.)

### (9)  Dr. Jerry Lin, Treating Physiatrist (2010-2011)

Martin first visited Dr. Jerry Lin in March 2010 for pain management.  (*Id.* at 647.)  Dr.

Lin noted that Martin had back pain that radiated to his legs, lower back pain, peripheral

neuropathy, diabetes, hypertension, a history of mini-strokes, high cholesterol, and gout.  (Tr.

647.)  Martin's treatment included opiate-based pain medication and physical therapy.  (*Id.*)  Dr.

Lin noted that Martin's leg weakness and decreased sensation were likely chronic.  (*Id.*)

Dr. Lin completed a Multiple Impairment Questionnaire on January 10, 2011, in which

he noted that Martin had chronic severe back pain with radiation to the feet and weakness in his

left leg.  (*Id.* at 623.)  He stated that the pain was caused by nerve inflammation and was

constant.  (*Id.* at 624-5.)  He also stated that Martin would be able to sit for up to one hour and

stand for up to one hour during an eight-hour workday, and that Martin should not stand or walk

continuously.  (*Id.* at 626.)  Dr. Lin wrote that Martin's symptoms started in 1975, after he was

11

injured in a car crash.  (Tr. 629.)

### 3.  Vocational Expert's Testimony

Vocational Expert Esperanza DiStefano ("DiStefano") testified that Martin's previous position as a police detective is considered a "skilled position" that requires "light exertion."  (*Id.* at 61.)  She also stated that a person who is limited to sedentary work and who cannot drive at night would not be able to work as a police detective.  (*Id.*)

DiStefano further testified that Martin's experience as a detective gave him many transferable skills, such as: knowledge of the law, practical thinking skills, interpersonal skills, knowledge of firearms, ability to handle high-pressure environments, ability to write reports, and ability to use office equipment.  (*Id.*)  DiStefano said that someone who has Martin's skills and limitations could work as an information clerk, a telephone solicitor, or an order filler, all of which are sedentary and semi-skilled positions.  (*Id.* at 61-62.)  DiStefano also acknowledged, however, that a person who cannot lift more than ten pounds, stand for more than an hour, or walk for more than an hour would "not be employable."  (*Id.* at 62-63.)

### 4.  The ALJ's Findings

On March 3, 2012, ALJ Katherine Edgell issued her decision that Martin was not under disability within the meaning of Sections 216(i) and 223(d) of the Social Security Act from May 31, 2001, through December 31, 2006, the date he was last insured.  (Tr. 12-22.)  First, Edgell found that Martin's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, prior to December 31, 2006.  (*Id.* at 17.)  Specifically, Edgell stated that the medical records did not show that Martin's diabetes-related illnesses were as severe as the medical listings.  (*Id.* at 18.)  Edgell also stated that Martin's spinal problems did not cause "any motor or sensory disturbances" as required by the

medical listings. (*Id.*)

Second, Edgell found that Martin retained the residual functional capacity ("RFC") to perform sedentary work though his last date insured. (*Id.*) Edgell wrote that Martin "could have stood and/or walked for a total of 2 hours; and sat for at least 6 hours" in an eight-hour workday. (*Id.*) To support her conclusion, Edgell cited the medical reports of Dr. Bernstein and Dr. Yablon that found Martin neurologically intact as late as 2009. (Tr. 18.) Edgell noted that Martin likely had nighttime driving restrictions that would impact potential employment. (*Id.*)

Edgell determined that Martin was not disabled prior to December 31, 2006. (*Id.* at 19.) She specifically noted that the medical documentation showed Martin's diabetes was well-controlled despite his "failure to adhere to a diabetic diet or refrain from imbibing alcohol." (*Id.*) Edgell further stated that "multiple contemporaneous examinations showed that [Martin] was fully neurologically intact, particularly with regard to sensory function," and that "no treating or examining source cited any significant physical limitations prior to the date last insured." (*Id.*) She supported her contention by stating that "all treatment [prior to the date last insured] was conservative in nature, with no indication of any orthopedic care." (*Id.*)

Edgell determined that Martin's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible[.]" (Tr. 19.) Edgell stated that, although Martin reported feeling chronic pain, "all examinations prior to the date last insured document that he was alert and in no acute distress." (*Id.* at 19.) She again pointed to the February 2007 reports from Dr. Bernstein and Dr. Yablon that state Martin was "feeling well" as evidence that the medical record "fails to corroborate the magnitude of [his] subjective pain allegations." (*Id.*)

Edgell gave no weight to any of Martin's physicians. (*Id.*) She found that Dr. Lin's

Multiple Impairment Questionnaire was not "relevant to the period at issue, insofar as he had first seen the claimant in 2010." (*Id.*) Dr. Bernstein's Multiple Impairment Questionnaire and Narrative Letter were "not accorded significant probative weight" because the "assertions are in no way corroborated by the doctor's own contemporaneous treatment records," and because Dr. Bernstein's "conclusions of chronic pain and functional compromise are contradicted by his own treatment records, which show [Martin] as doing well and having no complaints; with fully intact neurological functioning." (*Id.*)

Edgell did not find Dr. Zeitlin's 2010 determination that Martin was disabled to have "significant probative weight" because "such a contention is not objectively corroborated by the clinical medical documentation," and because Dr. Zeitlin did not "contemporaneously characterize [Martin] as being permanently disabled, nor did he even ascribe particular functional restrictions in his treatment records." (Tr. 19-20.) Edgell stated that Dr. Bernstein and Dr. Zeitlin could not determine that Martin was disabled because "the issue of disability is an administrative determination that is reserved to the Commissioner of Social Security." (*Id.* at 20.) Edgell discounted Dr. Medici's conclusion that Martin had arthritis of the knee prior to December 31, 2006, because of "later physical examinations that showed fully intact neurological functioning with no range of motion restrictions." (*Id.*) As such, Edgell determined that her assessment of Martin's RFC was "supported by the contemporaneous examination results that fail to adduce any significant restrictions; and which also fail to chronicle overt pain manifestations." (*Id.*)

Edgell concluded that Martin would not be able to perform his past relevant work as a police detective because of the exertion required of such a position. (*Id.*) However, she determined that, prior to the date last insured, he could have obtained work in another occupation

14

given his age, education, work experience, and RFC. (*Id.* at 21.) Edgell stated that the vocational expert's determination that Martin could find work as an information clerk, telephone solicitor, or order filler was "consistent with the information in the Dictionary of Occupational Titles" and that Martin could not be found disabled. (Tr. 21.)

## C.      Appeals Council Review

After the ALJ's decision on March 3, 2012, Martin requested review by the Appeals Council. (*Id.* at 8.) Martin submitted additional evidence, which included correspondence with his lawyer, representative brief, medical records from Rockland Neurological Associates, and medical records from Rockland Renal Associates. (*Id.* at 6.) The Appeals Council denied the request for review on March 18, 2013. (*Id.* at 1.)

## III.      DISCUSSION

## A.      Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's

decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("S.S.R."). *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (S.S.R.). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

16

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the determination] is based."  42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability.  *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-CV-1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand).  Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**B.      Determination of Disability**

**1.      Evaluation of Disability Claims**

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically

17

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically

equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the

evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5). A claimant's

RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a),

416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying

that a claimant's RFC is her maximum ability to perform full-time work on a regular and

continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant

medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the

opinions of treating and consultative physicians; and statements by the claimant and others

concerning the claimant's impairments, symptoms, physical limitations, and difficulty

performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also*

20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

     In evaluating the claimant's alleged symptoms and functional limitations for the purposes

of steps two, three, and four, the ALJ must follow a two-step process, first determining whether

the claimant has a "medically determinable impairment that could reasonably be expected to

produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at

49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so

that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."

20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has

"discretion in weighing the credibility of the claimant's testimony in light of the other evidence

of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979));

*see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be

"consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11-CV-3509 (GWG), 2012

WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility

determination).  The Commissioner has the burden of showing that "there is other gainful work

in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80

(2d Cir. 1998) (citation omitted).

### 2.    The Treating Physician Rule

A treating physician's opinion is typically entitled to "controlling weight," 20 C.F.R. §

404.1527(c)(2), and an ALJ is not permitted to "substitute his own expertise or view of the

medical proof for the treating physician's opinion." *Shaw v. Carter,* 221 F.3d 126, 134 (2d. Cir.

2000).  A treating physician's opinion, either contemporaneous or retrospective, will control

when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. §

404.1527(c)(2); *see also Byam v. Barnhart,* 336 F.3d 172, 183 (2d Cir. 2003) (quoting *Rivera v.

Sullivan,* 923 F.2d 964 (2d Cir. 1991)).  However, a treating physician's opinion will not be

afforded controlling weight when "the treating physician issued opinions that are not consistent

with . . . the opinions of other medical experts." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir.

2008). An ALJ who refuses to accord controlling weight to the medical opinion of a treating

physician must attempt to fill any clear gaps in the administrative record. *Id.* at 139.

Additionally, the ALJ must explicitly consider various "factors" to determine how much

weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d

Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)).  These factors include: (1) the length, nature, and

extent of the treatment relationship; (2) the evidence in support of the treating physician's

opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the

treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Finally, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

### 3. The ALJ Failed to Properly Consider the Evidence.

The Court must first determine whether the Commissioner applied the correct legal principles in assessing Martin's eligibility. *Rosa*, 168 F.3d at 77. Martin claims that the ALJ's decision was erroneous and not supported by substantial evidence, and that the decision is contrary to the law. (Pet'r's Compl. ("Compl.") ¶¶ 13, 14.) Specifically, he argues that the ALJ failed to follow the treating physician rule and to properly evaluate Martin's credibility. (Pl. Mem. 14-23.) The Court agrees.

### a.     The ALJ applied the five-step sequential analysis.

In reaching her conclusion, the ALJ completed the five-step sequential analysis as required by 20 C.F.R. §§ 404.1527 and 416.920.  First, the ALJ found that Martin did not engage in substantial gainful activity between the alleged onset date (May 31, 2001), through his date last insured (December 31, 2006).  (Tr. 17.)  At step two of the analysis, the ALJ found that, through the date last insured, Martin had several "severe" impairments, including diabetes mellitus, early diabetic neuropathy, early diabetic retinopathy, a lumbar disc herniation with disc bulging, and early arthritis of the right knee.  (*Id.*)  Under step three, the ALJ determined that Martin did not carry his burden of demonstrating a listing-level impairment or combination of impairments.  (*Id.*)  At step four, the ALJ determined that, through the date last insured, Martin had the RFC to perform sedentary work, with the exception that he could not meet a nighttime drive requirement.  (*Id.*)  In the final step of the analysis, the ALJ determined that Martin possessed skills that were transferable to other occupations "with jobs existing in significant numbers in the national economy."  (*Id.* at 21.)

### b.     The ALJ did not properly apply the treating physician rule.

#### (1)     The ALJ inappropriately supplanted her own view of the medical evidence for that of Martin's treating physicians.

Martin argues that the ALJ failed to consider many of Martin's doctor visits in making her determination that Martin's treating physicians' opinions should not be given significant probative weight.  (Pl. Mem. 15-16.)  To refute the ALJ's conclusion that Martin was not in chronic pain, Martin points to twelve doctor appointments in which he reported experiencing pain.  (*Id.*)  The Commissioner argues that the substantial evidence in the record supports the ALJ's interpretation of the medical evidence, pointing to five doctor appointments in which Martin reported "feeling well" to conclude that the doctors' contemporaneous notes contradict

22

their retrospective assessments. (Def. Mem. 18.)

The record shows that Martin reported experiencing neuropathic pain in his hands, feet, or back at least nineteen times prior to December 31, 2006. (Tr. 357, 360, 408, 427, 436, 443, 444, 448, 454, 455, 460, 462, 463, 562, 563, 567, 739, 757, 873.) His physicians' medical notes use the term "chronic" to describe Martin's pain at least four times prior to December 31, 2006. (*Id.* at 427, 448, 455, 739.) A 2003 MRI revealed lumbar herniation and bulging discs in Martin's spine. (*Id.* at 451.) Dr. Bernstein, Dr. Zeitlin, and Dr. Lin all concluded that Martin was disabled and experiencing restricted functioning capacity prior to December 31, 2006; no medical expert submitted any opinion concluding otherwise. (*Id.* at 401-02, 480, 629, 712.) Additionally, Dr. Bernstein and Dr. Lin independently determined that Martin could sit for one hour and stand for one hour during an eight-hour workday. (*Id.* at 18, 397.)

Before addressing the opinion evidence,[15] the ALJ summarized a portion of the medical evidence and found that "the clinical contemporaneous evidence does not support contentions of total disability through the date last insured." (*Id.* at 19.) In determining that Martin was not in chronic pain, she stated that he was "alert and in no acute distress" at "all examinations prior to the date last insured." (Tr. 19.) The ALJ determined that prior to the date last insured, Martin "could have stood and/or walked for a total of two hours; and sat for at least six hours" during an eight-hour workday. (*Id.* at 18.)

The ALJ violated the treating physician rule by supplanting her own view of the medical evidence for that of Martin's treating physicians. She interpreted medical evidence stating that Martin was "alert and in no acute distress" to mean that he was not in chronic pain prior to the date last insured, despite the conclusions of several of Martin's physicians that he was in chronic

---

[15] The opinion evidence consists of the Multiple Impairment Questionnaires and Narrative Reports, in which the treating physicians summarized their opinions of Martin's conditions.

pain. (*Id.* at 19, 401-02, 480, 629, 712.) Based on her interpretation of Dr. Bernstein's examination reports, the ALJ determined that Martin could sit for six hours and stand or walk for two hours in an eight-hour workday, in spite of Dr. Bernstein's own conclusion that Martin could sit for only one hour, stand for only one hour, and lay down for six hours during an eight-hour workday. (*Id.* at 18, 397.) In doing so, the ALJ relied on her own understanding of the medical records rather than the opinions of Martin's treating physicians.

> **(2)** **The ALJ did not give good reasons for according "no significant probative weight" to the opinions of Martin's treating physicians.**

Martin argues that Dr. Bernstein's opinion should have been given controlling weight. (Pl. Mem. 18.) He also contends that Dr. Lin's opinion should have been weighed against the factors set forth in 20 C.F.R. § 404.1527(c)(2) because Dr. Lin is a pain management specialist capable of recognizing that Martin's symptoms began prior to their first appointment. (*Id.* at 19- 20.) Martin also argues that the ALJ may not reject Dr. Bernstein's and Dr. Zeitlin's "valid medical opinions" that Martin was "disabled" on the grounds that a finding of "disabled" is reserved for the Commissioner. (*Id.* at 17.) The Commissioner argues that Dr. Bernstein and Dr. Zeitlin's opinions should not be given any weight because they are unsupported by their medical notes and contradicted by the record. (Def. Mem. 19-21.) The Commissioner also claims that Dr. Lin's opinions should not be given any weight because he did not treat Martin until after December 31, 2006. (*Id.* at 21.) The Commissioner contends that a finding of disability is reserved for the Commissioner under 20 C.F.R. § 404.1527(e), and that the physicians' opinions on the issue of disability may be ignored. (*Id.*)

Dr. Bernstein opined in his Narrative Report that Martin had a restricted functioning capacity as early as 2001 because of "chronic and irreversible" pain. (Tr. 480.) Dr. Zeitlin stated in his Narrative Report that Martin's neuropathy and back pain would have left him unable to work as early as in 2003. (*Id.* at 712.) Dr. Bernstein and Dr. Zeitlin opined that Martin was "disabled" prior to December 31, 2006, the date last insured. (*Id.* at 480, 712.) Both doctors based their conclusions on findings that Martin experienced chronic pain. (*Id.*) Dr. Lin stated in his Multiple Impairment Questionnaire that Martin's chronic back pain would have started as early as 1975, after he was injured in a car accident. (*Id.* at 629.)

After reviewing the opinion evidence, the ALJ determined that none of the treating physicians' opinions should be accorded significant probative weight. (*Id.* at 19-20.) The ALJ discounted Dr. Bernstein's opinion that Martin was disabled prior to December 2006 because his "conclusions . . . are contradicted by his own treatment records, which show [Martin] as doing well and having no complaints." (Tr. 19.) Similarly, the ALJ dismissed Dr. Zeitlin's retrospective opinion that Martin was disabled in 2003, because his contemporaneous notes did not characterize Martin as "disabled." (*Id.*) The ALJ also rejected Dr. Bernstein and Dr. Zeitlin's conclusions because "the issue of disability is an administrative determination that is reserved to the Commissioner[.]" (*Id.* at 20.) The ALJ excluded Dr. Lin's opinion outright because he did not treat Martin prior to the date last insured. (*Id.* at 19.)

Although an ALJ is permitted to completely reject a treating physician's opinion, such an outright rejection typically occurs when one treating doctor's opinion is contradicted by an examining doctor's opinion. *See, e.g., Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004). Here, though, there was no such contradiction. Rather, the ALJ found that none of Martin's

treating physicians' opinions were persuasive because their own examination notes contradicted their opinions. (Tr. 19-20.) The record does not support such a conclusion; as detailed above, the examination notes of Dr. Bernstein, Dr. Zeitlin, and Dr. Lin all indicate that Martin was in chronic pain. The ALJ did not provide "good reasons" for ignoring the doctors' opinions, as she was required to do, and failed to show that the doctors' opinions were inconsistent with the substantial evidence in the record. (*Id.* at 18-19.)

The ALJ discounted Dr. Bernstein's opinion that Martin was disabled prior to December 2006 because his "conclusions . . . are contradicted by his own treatment records, which show [Martin] as doing well and having no complaints." (*Id.* at 19.) The ALJ did not point to any of Dr. Bernstein's specific medical records to support her conclusion. (*Id.*) Although an ALJ need not reconcile every piece of conflicting evidence, *Zabala*, 595 F.3d at 410, the ALJ here broadly characterized Dr. Bernstein's medical records without discussing the evidence of Martin's chronic pain prior to December 31, 2006.

The ALJ also failed to discuss any specific medical evidence to support her conclusion that Dr. Zeitlin's opinion was not persuasive. Instead, she rejected Dr. Zeitlin's opinion because the doctor did not contemporaneously characterize Martin as "disabled." (Tr. 19.) Yet at the same time, the ALJ rejected both Dr. Bernstein's and Dr. Zeitlin's conclusions that Martin was "disabled" because "the issue of disability is an administrative determination that is reserved to the Commissioner[.]" (*Id.* at 20.) The ALJ thus placed undue emphasis on the treating physicians' use of the term "disabled," rather than evaluating the doctors' opinions as a whole.

Finally, the ALJ failed to provide "good reasons" for disregarding Dr. Lin's opinion because Dr. Lin did not treat Martin prior to his date last insured. In this Circuit, retrospective opinions may be given controlling weight, even when made several years after the alleged

disability onset. *See Byam*, 336 at 183. The ALJ's decision to disregard a treating physician's opinion was therefore not based on a "good reason."

      **c.**     **The ALJ did not properly evaluate Martin's credibility.**

The ALJ determined that Martin's impairments "could reasonably be expected to have caused the alleged symptoms," but that Martin's statements were "not fully credible for the period under consideration." (Tr. 19.) To support her conclusion, the ALJ stated that Martin was "alert and in no acute distress" prior to the date last insured. (*Id.*) She also noted that, when Martin visited Dr. Bernstein and Dr. Yablon in early 2007 visits, Martin stated that he was "feeling well, with no complaints." (*Id.*) Martin argues that the ALJ presented insufficient evidence to determine that Martin's statements were inconsistent with the record. (Pl. Mem. 21.) Relying on *Tarsia v. Astrue,* 417 Fed. Appx. 16, 19 (2d Cir. 2001), he also contends that the ALJ should have considered his exemplary work history because "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." (*Id.*) The Commissioner argues that the ALJ properly considered Martin's credibility. (Def. Mem. 22.)

Martin testified he worked for the police department for twenty-eight years, and that he was repeatedly promoted. (Tr. 41.) Martin experienced back pain beginning thirty years ago, which contributed to his early retirement. (*Id.* at 43-44.) He stated his diabetes-related neuropathy caused him a burning pain in his hands and feet. (*Id.* at 47-48) This pain caused Martin to spend most days since 2001 in bed. (*Id.*)

Although the ALJ has discretion in evaluating Martin's credibility, *Genier*, 606 F.3d at 49, the ALJ did not show that Martin's statements were inconsistent with the case record as a whole. The ALJ cited only two doctor appointments to determine that Martin's statements were

inconsistent with the record. (Tr. 19.) She did not indicate whether she considered Martin's

extensive work history. (*Id.*)

      **d.**    **Because the ALJ violated the treating physician rule, her**
                **determination of Martin's RFC was not supported by substantial**
                **evidence.**

      Step four of the analysis required the ALJ to determine Martin's RFC by analyzing

Martin's medical history and the opinions of Martin's treating physicians. *See* 20 C.F.R.

§ 404.1527(d); *see also Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir. 1993). The Commissioner

argues that the evidence in the record shows that Martin did not have a limited RFC prior to

December 31, 2006. (Def. Mem. 17-19.) However, as explained above, the ALJ failed to

comprehensively discuss how Martin's treating physicians' opinions were inconsistent with

substantial evidence in the record. The ALJ's failure to properly explain why she summarily

rejected each of Martin's treating physicians' opinions resulted in an improper RFC

determination that is not supported by substantial evidence.

      Step five of the analysis required the ALJ to determine Martin is capable of performing

other work. *See* 20 C.F.R. § 404.1527(d). The ALJ determined that Martin could have worked a

sedentary job prior to the date last insured. (Tr. 21.) The ALJ based the conclusion on the

vocational expert's testimony that Martin's experience working as police detective provided him

with transferrable skills. (*Id.*) However, the vocational expert also concluded that someone with

Martin's disabilities would be unemployable. (*Id.* at 62.) The ALJ did not address this portion

of the vocational expert's testimony in her decision.

      Furthermore, review of the case record reveals that Martin attended nearly 300 doctor

appointments between 2001 and 2011. However, the ALJ discussed only twenty-five doctor

visits in her opinion, and did not state why she selected those visits as the basis of her decision.

(*Id.* at 14-16.)  Both the ALJ and the Commissioner focused exclusively on the visits in which Martin had "no new complaints" to the exclusion of the numerous visits in which Martin complained of pain.  (Tr. 14-16; Def. Mem. 17-18.)  As such, the ALJ's decision appears to be based on a "mere scintilla" of the evidence and I recommend that a more comprehensive review of the record should be conducted on remand.

## C. Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand may be appropriate if "the ALJ has applied an improper legal standard." *Rosa v. Callahan,* 168 F.2d 72, 82-83 (2d Cir. 1999).  Here, because the ALJ committed legal error by improperly applying the treating physician rule and by failing to correctly assess Martin's credibility, I recommend remand.

### III. CONCLUSION

For the reasons set forth above, I recommend that Martin's motion be **GRANTED IN PART,** that the Commissioner's motion be **DENIED,** and that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) to consider a determination of disability that accords proper weight to the opinions of Dr. Bernstein, Dr. Zeitlin, and Dr. Lin.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Vernon S. Broderick, 40 Foley Square, Room 415, and to chambers of the undersigned, 500 Pearl Street, Room 1970.  Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States

Court of Appeals. *See Thomas v. Arn,* 746 U.S. 140, 150 (1985); *Small v. Sec'y of Health &*

*Human Servs.,* 892 F. 2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 72, 6(a), 6(d).

**DATED: August 12, 2014**
**New York, New York**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge